# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| KIA MOTORS AMERICA, INC.,<br>111 Peters Canyon Road<br>Irvine, CA 92606-1790<br><br>    Plaintiff,<br><br>v.<br><br>LUPIENT MILWAUKEE, INC., d/b/a<br>LUPIENT KIA MILWAUKEE,<br>6030 N. Green Bay Avenue<br>Glendale, WI 53209<br>    Defendant. | Civil Case No.:_____ |

## COMPLAINT

Plaintiff, Kia Motors America, Inc. ("KMA") brings this action against defendant Lupient Milwaukee, Inc. d/b/a Lupient Kia Milwaukee ("Lupient"), and hereby alleges as follows:

## PARTIES

1. KMA is a corporation organized and existing under the laws of the State of California with its principal place of business in Irvine, California.

2. Lupient is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business in Glendale, Wisconsin.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over defendant because defendant resides in the State of Wisconsin and is doing business here.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the defendant resides in this district and a substantial part of the events giving rise to the claim occurred in this district.

## ALLEGATIONS OF FACT

A. **The Dealer Agreement**

6. KMA is the exclusive U.S. distributor of Kia brand motor vehicles, parts and accessories ("Kia Products").

7. KMA and Lupient are parties to a Kia Dealer Sales and Service Agreement executed on or about November 16, 2018 (the "Dealer Agreement"), pursuant to which KMA appointed Lupient as an authorized Kia dealer at 6030 North Green Bay Avenue, Glendale, Wisconsin. A copy of the Dealer Agreement is annexed hereto as Exhibit A.

8. In Article IX.C.1 of the Dealer Agreement, Lupient agreed to render warranty service on eligible Kia Products to all purchasers of such products from any authorized Kia dealer in accordance with KMA's then current warranty policies and procedures manual.

9. In Article IX.C.3 of the Dealer Agreement, Lupient agreed that the customer would not be obliged to pay any charges for warranty work, and KMA agreed to compensate Lupient for all warranty work, including labor, in accordance with procedures and rates to be announced from time to time by KMA and in accordance with applicable law.

10. In Article IX.A.1 of the Dealer Agreement, Lupient agreed that KMA "shall have the right at all reasonable times and during regular business hours to inspect [Lupient's] facilities and to examine, audit and reproduce all records, accounts and supporting data relating to the Kia dealership operations of [Lupient] including without limitation, the sale, sales reporting, service and repair of Kia Products by [Lupient]."

B. **Compensation for Labor**

11. Pursuant to the customs and practices of the automotive industry, charges for labor are customarily based on a "flat rate"—i.e., not on the actual time that it takes an individual technician to perform the repair on a specific vehicle, but on preset time allowances that have been determined to be reasonable and sufficient to perform the particular repair operation.

12. This practice is designed to promote service technician efficiency and fair charges to customers. An efficient technician who performs repairs in less time than the preset time allotments (as experienced technicians normally do) can earn compensation for more labor hours than he or she actually works. On the other hand, if the technician takes longer than the time allowance to perform a repair, the customer will still be charged only for the amount of time allowed, unless there was justification for exceeding the time allowance.

13. For most warranty repairs, KMA compensates dealers for labor performed in warranty repairs based on time allowances that are set forth in KMA's warranty policies and procedures manual.

14. Kia dealers are not required to use the KMA time allowances when performing customer-pay retail repairs.

15. When franchised new motor vehicle dealers and independent repair shops perform repairs but do not use the manufacturer's time allowances, it is the custom and practice of the industry for them to use time allowances published by some other recognized industry source (such as Chilton's or Alldata). It is contrary to industry practice for a dealer to simply create its own time allowances unrelated to the time actually spent repairing the vehicle.

16. KMA has policies and procedures for establishing an individual dealer's warranty labor rate, which include the application of applicable law affecting the setting of labor rates.

17. Pursuant to the Wisconsin Motor Vehicle Dealer Law, Wis. Stat. §§ 218.0101 to 218.0163 (the "Dealer Law"), every manufacturer or distributor of motor vehicles must "reasonably compensate" any authorized dealer who performs warranty repairs. Wis. Stat. § 218.0125(3) (motorcycle manufacturers and distributors), (3m) (manufacturers and distributors of all motor vehicles except to motorcycles).

18. The Dealer Law generally deems reasonable compensation for both labor and parts used in warranty repairs to be equal to the amount that the dealer charges a retail customer. Wis. Stat. § 218.0125 (2m) (motorcycle labor), (3) (motorcycle parts), (3m) (other motor vehicle labor and parts).

19. The Dealer Law, as amended in 2011, provides different methods for determining the retail rates of motorcycle dealers and other motor vehicle dealers.

20. Every manufacturer or distributor of motor vehicles—except manufacturers or distributors of motorcycles—must pay, if requested by its dealer, a labor rate determined by "dividing the total customer labor charges for qualifying nonwarranty repairs" in repair orders submitted by the dealer "by the total number of hours that would be allowed for the repairs if the repairs were made under the manufacturer's, importer's or distributor's time allowances used in compensating the dealer for warranty work." Wis. Stat. § 218.0125 (3m)(c)1.

21. In connection with the labor rate calculation described in the preceding paragraph, the dealer must submit to the manufacturer or distributor "[e]ither 100 sequential repair orders for qualifying nonwarranty repairs or all repair orders for qualifying nonwarranty repairs performed in a 90-day period, whichever is less." Wis. Stat. § 218.0125(4m)(a)2.

22. The Dealer Law does not require motorcycle manufacturers to compensate dealers for labor pursuant to the methodology in subsections (3m) and (4m) of section 218.0125. Instead, it requires motorcycle manufacturers to compensate their dealers at "the effective labor rate

charged all customers and for parts at an amount not less than the amount the dealer charges its other retail service customers for parts used in performing similar work by the dealer." Wis. Stat. § 218.0125(2m). This same standard applied to all motor vehicle dealers prior to the 2011 amendments to the Dealer Law.

23. Wisconsin Administrative Code § 139.06(8)(b) provides that "[t]he 'effective labor rate charged all customers' by the dealer is determined by dividing the total non-warranty charges by the total non-warranty repair hours billed by the dealership for each class of repairs for same make vehicles during the same period."

C. **Lupient Requests a 77% Increase In Labor Compensation from KMA**

24. As of April 2019, KMA was compensating Lupient for warranty work at a labor rate of $135 per hour.

25. The $135 rate was consistent with the information provided by Lupient in the monthly financial statements it submitted to KMA.

26. According to Lupient's April 2019 financial statement, its "posted" retail rate, (that is, the rate it generally advised retail customers it was charging them for labor) was $126.50 per hour. Its "effective" retail rate (that is, the gross amount it actually was paid by retail customers divided by the number of hours charged) was $109.86 per hour.

27. Lupient's April 2019 financial statement reported that its warranty labor rate was $135 per hour, and that its effective warranty labor rate (that is, the gross amount KMA paid Lupient for warranty labor work divided by the number of hours of warranty work performed) was $133.61 per hour.

28. Thus, according to Lupient's own financial statements, as of April 2019, Lupient was making $23.75 more per hour on warranty work than on retail work.

29. Notwithstanding the fact that its warranty rate was already higher than its posted and effective retail rates, Lupient requested, in a letter dated April 23, 2019, an increase in its warranty labor rate from $135 per hour to $238.76 per hour. A copy of the letter is annexed hereto as Exhibit B.

30. The letter was accompanied by (a) 97 non-sequentially numbered repair orders ("ROs") dated from December 27, 2018 through March 25, 2019; (b) another letter dated April 23, 2019 from a company called Armatus Dealer Uplift ("Armatus"), representing that the ROs were "consecutive customer paid Qualified ROs"; and (c) a spreadsheet showing Lupient's and/or Armatus's calculations for arriving at the $238.76 rate ("Lupient's Spreadsheet"). A copy of Armatus's letter is annexed hereto as Exhibit C; a copy of Lupient's Spreadsheet is annexed hereto as Exhibit D.

D. **KMA Questions Lupient's Request**

31. KMA received the April 23, 2019, letter on April 25, 2019.

32. KMA did not believe that the $238.76 rate could have been calculated correctly. The rate was 77% higher than Lupient's existing $135 warranty rate; more than twice the effective retail labor rate reflected on Lupient's own financial statements; and almost twice as high as the average hourly rate that KMA paid to Kia dealers in Wisconsin.

33. Had Lupient's labor rate been calculated pursuant to the methodology in Wisconsin Administrative Code § 139.06(8)(b)—which is the methodology more commonly used in the industry and the methodology applicable to motorcycle manufacturers in Wisconsin—the labor rate would have been $131.94, not $238.76.

34. Rather than immediately responding in writing to Lupient's requested increase, KMA sought to have a discussion with Lupient concerning the calculation of the labor rate.

35. By letter dated June 3, 2019, Lupient advised KMA of Lupient's position that the requested $238.76 hourly rate had gone into effect as of May 25, 2019, due to KMA's failure to issue a written response to the request within 30 days of receipt, a time frame set forth in Wis. Stat. § 218.0125(4m)(b). A copy of the June 3, 2019 letter is annexed hereto as Exhibit E.

36. The June 3, 2019, letter also stated that, "without prejudice" to Lupient's position, Lupient was "willing to allow [KMA] to issue a statutorily conforming response."

37. By email dated June 4, 2019, KMA advised Lupient of its belief that the $238.76 hourly rate had been incorrectly calculated and that the hourly rate actually reflected on the repair orders was $131.94.

38. By letter dated June 5, 2019, Lupient disputed KMA's position, stating that use of its actual hourly retail repair rate was "inappropriate" because the statute entitled it to divide the total time charges on the ROs by the number of hours that KMA would have allowed for the same repairs. A copy of the June 5, 2019, letter is annexed hereto as Exhibit F.

39. The wide disparity between the $131.94 rate and the $238.76 rate was the result of the number of hours that Lupient was charging customers for repairs. Based on the Lupient's Spreadsheet, Lupient was generally charging customers for amounts of labor time that were far in excess of the times allowed for the same repairs by KMA.

40. For example, KMA pays its dealers .20 hours to replace an accelerator pedal. According to an RO that it submitted to KMA, however, Lupient charged a customer 2.0 hours for that same repair—10 times as much as the KMA allowance. As a result, Lupient's recalculated rate for the repair, based on KMA's time allowance, was $1,412.95 per hour.

41. Lupient's Spreadsheet contains numerous additional entries indicating that Lupient charged retail customer for labor time far in excess of the KMA allowance, resulting in exorbitant hourly rates based on KMA's time allowances. For example: (a) $1,020 per hour to

diagnose a high-speed relay; (b) $933.33 per hour to replace a backup camera; (c) $680 per hour to replace an ignition cylinder; (d) $661.15 per hour to replace front sway bar links; and (e) $632.50 per hour for a pump repair.

42. Lupient concluded its June 5, 2019, letter to KMA as follows: "Notwithstanding but without prejudice to the position taken in our June 3 letter, as to which all rights are hereby reserved, we shall afford you one further opportunity to issue a statutorily compliant response, if any, provided that such is promptly forthcoming."

43. By letter dated June 14, 2019, KMA: (a) denied Lupient's request for a warranty labor rate of $238.76 per hour on the ground that it was unreasonable based on a comparison to the rates paid to other Wisconsin dealers and on the excessive time allowances employed by Lupient; and (b) stated that the rate substantiated by Lupient's submission was $131.94 per hour and that, since Lupient was already being compensated at $135 per hour, KMA did not believe there was any basis for an increase. A copy of KMA's June 14, 2019, letter is annexed hereto as Exhibit G.

E. **KMA Pays the Requested Rate Under Protest**

44. KMA concluded its June 14, 2019, letter by asking Lupient to advise KMA whether Lupient continued to claim entitlement to an increase notwithstanding the information in KMA's letter and advised Lupient that, if Lupient maintained its request for an increase, KMA would need to conduct an audit of Lupient's non-warranty repair records.

45. Lupient responded by letter dated June 19, 2019, stating (among other things) that: (a) labor rates do not have to be reasonable under the Wisconsin statute; (b) comparing Lupient's labor rate to the labor rates of other Wisconsin dealers was "inappropriate"; and (c) Lupient's requested labor rate of $238.76 per hour took effect by operation of law on May 25, 2019. A copy of Lupient's June 19, 2019, letter is annexed hereto as Exhibit H.

46. By letter dated July 5, 2019, KMA disputed the positions taken in Lupient's June 19, 2019, letter, but advised Lupient that, "in an abundance of caution, KMA will pay [Lupient] for warranty labor at the $238.76 rate for repair orders opened on or after May 25, 2019, . . . <u>under a full reservation of all of its rights</u>, including the right to charge back [Lupient] if and when it is ultimately determined by a court or jury that KMA is not required to pay [Lupient's] claimed rate of $238.76 per hour." A copy of KMA's July 5, 2019, letter is annexed hereto as Exhibit I.

47. In its July 5, 2019, letter, KMA also advised Lupient that KMA intended to conduct an audit of the dealership's non-warranty repair records.

48. According to the monthly financial statements that Lupient has submitted to KMA, in the six full months since KMA commenced paying the $238.76 rate (July through December 2019), KMA has paid Lupient $183,846 for warranty labor. On this amount, Lupient made a gross profit of $167,215, for a gross profit percentage of 90.95%, meaning that Lupient's marginal cost of labor to obtain the $183,846 from KMA was only $16,631.

49. Upon information and belief, certain of Lupient's time charges are not only in excess of KMA's time allowances but are in excess of, and/or not based on, any time allowances published by any recognized industry source and are unreasonable and unfair to the retail customers to whom the charges were rendered.

F. **Lupient Terminates KMA's Labor Rate Audit**

50. By letter to Jeff Lupient, the President of Lupient, dated November 5, 2019, KMA notified Lupient that KMA intended to conduct an on-site "labor rate audit" at Lupient's dealership on November 19, 2019. The letter specified the records that KMA intended to review, including all non-warranty ROs, the labor time guidelines that Lupient used for its retail repairs,

and records relating to the amount of time Lupient's technicians actually spent on such repairs. A copy of the November 5, 2019, letter is annexed hereto as Exhibit J.

51. By email to Lupient dated November 13, 2019, KMA confirmed that it would conduct the audit on November 19, 2019, and requested original documentation for all retail repair orders, including service advisor documentation, technician notes and time stamps, accounting records, and records of customer payments, among other things. A copy of the November 13, 2019, email is annexed hereto as Exhibit K.

52. At no time between November 5, 2019, and November 19, 2019, did Lupient express any objection to the labor rate audit described in KMA's November 5, 2019, letter and November 13, 2019, email.

53. Three KMA employees who work at KMA's headquarters in Irvine, California, and the KMA District Parts and Service Manager, whose district includes Lupient, travelled at considerable expense to Milwaukee to conduct the audit on November 19, 2019.

54. When the KMA employees arrived at the dealership shortly after 8:00 AM on November 19, 2019, the dealership service manager provided them with a room in which to conduct the audit and with a portion of the records that KMA had requested by letter and email, and the KMA employees commenced their review of the documents provided.

55. Approximately one and a half hours later, however, the dealership's general manager and the service director for the Lupient dealer organization instructed the KMA employees to cease all audit activity until further notice. At 11:30 AM, the dealership's general manager advised the KMA employees that Jeff Lupient had directed the dealership not to cooperate any further with the audit and asked the KMA employees to leave the dealership, which they did.

56. At the time of directing the KMA employees to discontinue the audit and in subsequent correspondence, Lupient has taken the position that KMA has no right to conduct an audit of the labor rate that Lupient charges to its retail service customers.

## FIRST CLAIM FOR RELIEF (DECLARATORY JUDGMENT)

57. KMA repeats and realleges each and every allegation set forth in paragraphs 1 to 56 as if fully set forth herein.

58. There is an actual case or controversy between KMA and Lupient concerning the interpretation, construction, and application of Wis. Stat. § 218.0125.

59. Section 218.0125 requires distributors such as KMA to "reasonably compensate" their dealers for warranty work.

60. Under Wisconsin law, a court may construe a statute if a literal application would lead to an absurd or unreasonable result.

61. Under Wisconsin law, it is always presumed, in respect to a statute, that no absurd or unreasonable result was intended by the Legislature.

62. Based on the language, structure and intent of the statute, § 218.0125 should be interpreted, construed and applied to require that a dealer's requested labor rate to be reasonable.

63. Lupient's calculation of its requested labor rate increase under § 218.0125 leads to an absurd and unreasonable result because, inter alia, (a) Lupient's own financial statements indicate that Lupient was already receiving $23.75 more per hour from KMA for warranty repairs than it was receiving from customers for nonwarranty repairs at the time Lupient requested the increase; (b) the $238.76 rate is more than double Lupient's effective retail rate as shown on its April 2019 financial statements; (c) the $238.76 rate is 77% higher than Lupient's previous rate; (d) KMA's payment of the $238.76 rate has resulted in Lupient achieving profit margins of over 90% on warranty labor; (e) the $238.76 rate is almost double the average rate

that KMA pays to other Kia dealers in Wisconsin ($122.93) and is $92.44 per hour higher than the next-highest rate that KMA pays to any Kia dealer in Wisconsin; (f) on information and belief, the rate is substantially higher than the rates paid by competing motor vehicle manufacturers and distributors to their dealerships in Wisconsin; and (g) the rate is based on unreasonable and excessive amounts of time which Lupient charged its retail customers for the repairs on the repair orders submitted with Lupient's request for an increase.

64. By reason of the foregoing, KMA requests a declaratory judgment pursuant to 28 U.S.C. § 2201, that it is not required to pay the $238.76 hourly rate requested by Lupient and that it may continue to pay the previously agreed upon rate of $135 per hour for labor.

### SECOND CLAIM FOR RELIEF (UNJUST ENRICHMENT)

65. KMA repeats and realleges each and every allegation set forth in paragraphs 1 through 64 as if fully set forth herein.

66. KMA has conferred a benefit upon Lupient in the form of payments for warranty labor at the rate of $238.76 per hour for warranty repair orders opened on and after May 25, 2019.

67. Lupient has knowledge of the benefit that KMA has conferred upon it.

68. Lupient has accepted and retained the benefit conferred upon it by KMA under circumstances such that it would be inequitable for Lupient to retain the benefit without repayment of the value thereof.

69. By reason of the foregoing, Lupient has been unjustly enriched in the amount KMA has paid it over and above a reasonable retail rate and should be ordered to make restitution of that amount to KMA.

### THIRD CLAIM FOR RELIEF (DECLARATORY AND INJUNCTIVE RELIEF)

70. KMA repeats and realleges each and every allegation set forth in paragraphs 1 through 69 as if fully set forth herein.

71. KMA had the right to conduct the labor rate audit under Article IX.A.6 of the Dealer Agreement.

72. Lupient's termination of the audit was a violation of KMA's rights and a breach of Lupient's obligations under the Dealer Agreement.

73. KMA also had a right to conduct the audit under Wisconsin Administrative Code § 139.06(8)(c)(f).

74. Lupient's termination of the audit was a violation of KMA's rights under the Dealer Agreement and Wisconsin Administrative Code 139.06(8)(c)(f).

75. By reason of the foregoing, KMA requests (a) a declaratory judgment that it has the right to conduct the audit; (b) a preliminary order directing Lupient to permit KMA to continue and complete the audit; and (c) a permanent injunction requiring Lupient to permit KMA to conduct and to cooperate with similar audits in the future.

### **FOURTH CLAIM FOR RELIEF (BREACH OF CONTRACT)**

76. KMA repeats and realleges each and every allegation set forth in paragraphs 1 through 75 as if fully set forth herein.

77. By terminating the audit being conducted by KMA on November 19, 2019, Lupient violated KMA's contract rights and breached its contractual obligations under the Dealer Agreement.

78. Lupient also breached the duty of good faith and fair dealing by not advising KMA of its objections to the audit following receipt of the November 5, 2019 letter notifying Lupient of the Audit and instead permitting the KMA employees to travel to Milwaukee Wisconsin to commence the audit and then abruptly terminating the audit and asking them to leave.

79. By reason of the foregoing, KMA is entitled to recover from Lupient the damages KMA suffered as a result of Lupient's breach, including the expenses that KMA incurred in connection with the aborted audit.

**WHEREFORE**, KMA prays for judgment as follows:

(a) On the First Claim for Relief, a judgment declaring: that any labor rate requested under Wis. Stat. § 218.0125 must be reasonable; that Lupient's requested rate of $238.76 per hour is not reasonable; and that KMA may continue to pay Lupient the prior rate of $135 per hour;

(b) On the Second Claim for Relief, restitution by Lupient to KMA of the aggregate difference between the $238.76 per hour rate and the $135 per hour rate on all claims for which KMA has paid Lupient $238.76 per hour;

(c) on the Third Claim for Relief, a judgment declaring that KMA has the contractual and statutory right to audit Lupient's retail service records and granting preliminary and permanent injunctive relief requiring Lupient to permit KMA to conduct such audits; and

(d) on the Fourth Claim for Relief, an award of damages incurred by KMA as a result of Lupient's termination of the November 18, 2019 audit;

(e) together with interest, costs, and such other and further relief as the Court deems just and proper.

Dated at Milwaukee, Wisconsin, this 2nd day of March, 2020.

> von BRIESEN & ROPER, s.c.
> Attorneys for Plaintiff, Kia Motors America, Inc.
>
> By: __/s/ Ryan P. Fetherston_____
> James T. Murray, Jr., SBN 1016026
> Ryan P. Fetherston, SBN 1059476
> 411 E. Wisconsin Ave., Suite 1000
> Milwaukee, WI 53202
> Tel: (414) 221-6607
> Email: jmurray@vonbriesen.com
> rfetherston@vonbriesen.com
>
> OF COUNSEL:
> John J. Sullivan
> (*Pro hac vice* motion to be filed)
> HOGAN LOVELLS US LLP
> 390 Madison Avenue
> New York, New York 10017
> Tel: (212) 918-3000
> Email: john.sullivan@hoganlovells.com